IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

RONALD N. E. [1]
    Plaintiff,

        v.                          Civil No. 3:19cv281 (MHL)

ANDREW M. SAUL, [2]
Commissioner of Social Security,
    Defendant.

## REPORT AND RECOMMENDATION

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act (the "Act").

Ronald N. E. ("Plaintiff"), fifty-five years old at the time of this Report and Recommendation, previously worked as a pallet repairman. (R. at 38, 60.) Since Plaintiff was hit by a car in the 1980s, he claims to have experienced worsening hip and back pain. (R. at 39.) After Plaintiff's pain continued to worsen, he sought medical evaluation and treatment. (R. at 337, 339, 343-47, 350, 372-76, 378-402.) A CT scan revealed that Plaintiff has avascular necrosis[3] of the right femoral head without fracture. (R. at 372.) Plaintiff also suffers from chronic obstructive

---

[1]     The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2]     On June 4, 2019, the United States Senate confirmed Andrew M. Saul to a six-year term as the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul should be substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this matter.

[3]     Avascular necrosis is the death of bone tissue due to a lack of blood supply; it can lead to tiny breaks in the bone and the bone's eventual collapse. *Avascular necrosis*, Mayo Clinic (Apr. 22, 2020), *available at* https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859.

pulmonary disease ("COPD"). (R. at 47.) While Plaintiff graduated from high school with a standard diploma, he attended special education classes until sixth grade and states that he still "can't read that good." (R. at 53-54, 113.)

On September 26, 2016, Plaintiff applied for DIB under Title II of the Act and SSI under Title XVI of the Act, alleging disability from avascular necrosis of the right hip, degenerative disc disease, osteoarthritis and COPD, with an alleged onset date of May 31, 2015. The Social Security Administration ("SSA") denied Plaintiff's claims, and after exhausting his administrative remedies, Plaintiff now seeks review of the Administrative Law Judge's ("ALJ") decision. This matter now comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross motions for summary judgment, rendering the matter ripe for review.[4]

Plaintiff argues that the ALJ erred in four respects, the first three of which relate to Plaintiff's residual functional capacity as formulated by the ALJ. First, Plaintiff argues that the ALJ erred by failing to properly apply the two-step pain analysis under *Craig v. Chater*.[5] (Mem. in Support of Pl.'s Mot. For Summ. J. at 3-4, ECF No. 14 ("Pl.'s Mem.").) Plaintiff next challenges the ALJ's decision assigning only partial weight to the medical opinion Dr. Joseph Seacrist, M.D., who offered a more restricted opinion on Plaintiff's ability to work. (Pl.'s Mem. at 5-6.) Third, Plaintiff argues the ALJ failed to account for the effect of Plaintiff's pain on his ability to

---

[4]      The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

[5]      76 F.3d 585 (4th Cir. 1996).

concentrate. (Pl.'s Mem. at 6.) Finally, Plaintiff argues that the ALJ failed to account for Plaintiff's functional illiteracy. (Pl.'s Mem. at 7-8.)

For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

## I.  PROCEDURAL HISTORY

On September 26, 2016, Plaintiff filed for DIB and SSI, with an alleged onset date of May 31, 2015. (R. at 15.) The SSA denied his claims initially on February 15, 2017, and again upon reconsideration on April 25, 2017. (R. at 15.) On July 27, 2018, the ALJ issued a written opinion, denying Plaintiff's claims. (R. at 15-24.) The ALJ concluded that Plaintiff did not qualify as disabled under the Act because Plaintiff could perform work existing in significant numbers in the national economy. (R. at 24.) On March 26, 2019, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner, subject to review by this Court. (R. at 1-3.) Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II.  STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court "will affirm the Social Security Administration's disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence, and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v.*

*Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§

404.1520(a)(4)(iii), 416.920(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most the claimant can do despite his physical and mental limitations. §§ 404.1545(a), 416.945(a). At step four, the ALJ assesses whether the claimant can perform his past work given his RFC. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, at step five, the ALJ determines whether the claimant can perform any work existing in the national economy. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.  THE ALJ'S DECISION AND RELEVANT REGULATIONS

On May 2, 2018, the ALJ held a hearing during which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (R. at 31-67.) On July 27, 2018, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act. (R. at 15-24.) The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-24.)

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from the time of his alleged onset date, May 31, 2015. (R. at 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: avascular necrosis of the right hip, degenerative disc disease, osteoarthritis and COPD. (R. at 17.) At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18.) After step three, the ALJ next considered Plaintiff's residual functional capacity. (R. at 19.) The ALJ found that Plaintiff had the residual functional capacity to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 415.967(b). (R. at 19.) Specifically, the ALJ found that Plaintiff could understand, remember and carry out simple and routine work-related instructions and concentrate for periods of two hours on work-related tasks before requiring

a break. (R. at 19.) At step four, based on Plaintiff's age, work experience and RFC, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 22.) However, at step five, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including the representative occupations of cleaner, sorter and packer. (R. at 24.) Accordingly, the ALJ concluded that Plaintiff did not qualify as disabled under the Act. (R. at 24.)

## IV.  ANALYSIS

As described above, Plaintiff's appeal to this Court challenges the ALJ's formulation of Plaintiff's residual functional capacity by alleging that the ALJ erred by: (1) conducting an improper *Craig* analysis, by failing to determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce Plaintiff's pain or symptoms and failing to explain why the record as a whole does not support Plaintiff's complaints of pain; (2) assigning partial weight to the opinion of Dr. Seacrist, and failing to observe the "treating physician rule;" and (3) failing to account for the effect of Plaintiff's pain on his ability to concentrate. Plaintiff also alleges that at step five, the ALJ erred by failing to account for Plaintiff's "functional illiteracy." (Pl.'s Mem. at 3, 4, 7.)

### A.  The ALJ Properly Formulated Plaintiff's Residual Functional Capacity.

After step three of the ALJ's analysis, but before making a determination whether the claimant can perform past relevant work, the ALJ must assess the claimant's RFC. 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC "is 'the most' the claimant 'can still do despite' physical and mental limitations that affect her ability to work." *Mascio*, 780 F.3d at 635 (quoting § 416.929(a)(1)). In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. §§ 404.1545(b), 416.945(b).

The RFC must incorporate impairments supported by objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. §§ 404.1529(a), 416.929(a). Subjective allegations of pain are not, alone, conclusive evidence that a claimant qualifies as disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994.) The Fourth Circuit has determined that "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

Thus, when evaluating a claimant's subjective claims of pain in the context of an RFC determination, the ALJ must follow a two-step analysis. §§ 404.1529(a), 416.929(a); *Craig*, 76 F.3d at 594; *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996). The first step requires the ALJ to determine the existence of an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the claimant's pain or related symptoms. §§ 404.1529(b), 416.929(b); *Craig*, 76 F.3d at 594. This threshold determination requires a showing, by objective evidence, "of the existence of a medical impairment 'which could be reasonably expected to produce' the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 594. Only after this threshold determination may the ALJ evaluate the intensity and persistence of the claimant's pain and "the extent to which it affects the claimant's ability to work." *Id.* at 595.

In considering the intensity and persistence of a claimant's alleged pain, the ALJ must examine the entire record, including objective medical evidence, statements and other information provided by medical sources, the claimant's statements and statements provided by other individuals. §§ 404.1529(a), 416.929(a); SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017). Objective medical evidence may include clinical or laboratory diagnostic tests. SSR 15-3P. Information

provided by medical sources may include diagnoses, prognoses, medical opinions, as well as medical statements about a claimant's history, treatment, responses to treatment, daily activities and other information concerning the intensity, persistence and limiting effects of the claimant's symptoms. *Id*. The claimant himself may make statements about symptoms, either directly to medical sources, other sources or directly to the ALJ, and the ALJ will evaluate whether the statements are consistent with objective medical evidence and other evidence. *Id*. Lastly, the ALJ may consider statements provided by other individuals, including statements from non-medical sources such as family and friends. The ALJ will consider the personal observations of an individual "in terms of how consistent those observations are with the [claimant's] statements about his . . . symptoms." *Id*.

During the sequential analysis, the ALJ must also analyze any developed medical evidence such as expert evaluations. §§ 404.1512, 404.1527, 416.912, 416.927. Generally, an ALJ will give more weight to the medical opinion of a source who has examined the claimant personally. §§ 404.1527, 416.927. Further, an ALJ will give more weight to medical opinions from treating physicians and will give controlling weight to a treating source's medical opinion that is well-supported by other substantial evidence in the claimant's case record. §§ 404.1527, 416.927. If the medical opinions are inconsistent with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d). The regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, § 404.1527(c)(1). The ALJ may also consider the opinion of nonmedical sources, though the evaluation of an opinion from a nonmedical source depends on the particular facts in each case. §§ 404.1527, 416.927.

### 1. *The ALJ Properly Considered Plaintiff's Pain as Required by* **Craig v. Chater.**

Plaintiff first argues that the ALJ, in formulating Plaintiff's residual functional capacity, applied the wrong standard in determining whether Plaintiff is disabled by pain or other symptoms and erred at both step one and step two of the *Craig* analysis. (Pl.'s Mem. at 3.)

*Craig* provides a two-step analysis to determine whether a claimant is disabled by pain or other symptoms. 76 F.3d at 594. The *Craig* analysis first requires the ALJ to consider whether an underlying medically determinable physical or mental impairment could reasonably produce the claimant's alleged pain or other symptoms. *Id.* After this threshold determination, the ALJ then evaluates the intensity and persistence of those symptoms to determine the extent to which they limit the claimant's ability to do basic work activities. *Id.* at 595.

### a. The ALJ Properly Determined That Plaintiff Suffered from an Underlying Medically Determinable Physical Impairment That Could Reasonably Be Expected to Produce his Pain or Symptoms.

Plaintiff alleges that the ALJ did not address step one of the *Craig* analysis and instead skipped straight to step two. (Pl.'s Mem. at 3.) Defendant responds that the ALJ properly addressed step one of the *Craig* analysis by correctly determining that Plaintiff had underlying medically determinable impairments — avascular necrosis of the right femoral head and mild forminal stenosis — that could cause Plaintiff's alleged pain and symptoms. (Def.'s Mem. at 15.)

Here, the ALJ laid out both steps of the *Craig* analysis at the outset of his RFC determination. (R. at 19-20.) The ALJ then reviewed the findings and opinions of Dr. Seacrist and DDS medical consultants, assigning partial weight to each opinion. (R. at 20-21.) The ALJ also reviewed Plaintiff's medical history. (R. at 22.) In reviewing Plaintiff's medical history, the ALJ concluded that a "CT scan of the claimant's pelvis revealed stage two or three avascular necrosis of the right femoral head" and that radiographic imaging revealed "mild posterior disc space . . . stable mild chronic anterior disc bulges and endplate spurring of the entire lumbar spine, and mild

soraminal stenosis at L4-S1." (R. at 20-21.) After reviewing Plaintiff's symptoms, treatment and medical evaluations, the ALJ concluded that the "record supports the *types* of limitations that the claimant has alleged," and progressed to step two. (R. at 22.)

Plaintiff fairly points out that the ALJ did not explicitly discuss the first step under *Craig*. (Pl.'s Mem. at 3.) Instead, rather than address Plaintiff's *pain*, the ALJ addressed "the *types* of limitations that the claimant has alleged," finding that the limitations were supported by the record. (R. at 22.) Step one of the *Craig* analysis is a threshold determination. Courts within the Fourth Circuit have declined to remand when the ALJ does not explicitly discuss step one and have affirmed similar applications of the *Craig* analysis.[6] Consistent with those courts not requiring an explicit discussion, the Court finds that the ALJ's discussion of Plaintiff's medical record and diagnoses, along with the ALJ's conclusion that the "record supports the *types* of limitations that the claimant has alleged," satisfies step one of the *Craig* analysis. (R. at 22.) The Court, therefore, declines to recommend remand on that basis.

### b. Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Subjective Complaints of Pain.

Plaintiff also argues that the ALJ erred at step two of the *Craig* analysis, which requires the ALJ to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit his ability to perform work-related activities. *Craig*, 76 F.3d at 595. Specifically, Plaintiff challenges the ALJ's finding that "the

---

[6]     *Powell v. Colvin*, No. 3:16-cv-56, 2016 WL 6562071 (E.D. Va. Oct. 14, 2016) (finding that an ALJ did not err by finding that the plaintiff's impairments could be reasonably expected to cause some of the alleged symptoms); *see also Bullock v. Astrue*, No. 3:08-CV-371, 2009 WL 1350662, at *13-14 (E.D. Va. May 12, 2009) (affirming the ALJ's determination that the "claimant's medically determinable impairments could reasonably be expected to produce *some* of the alleged symptoms."); *Smith v. Astrue*, No. 3:09cv488, 2011 WL 1303637, at *4 (W.D.N.C. March 31, 2011) ("…*Craig* does not require specific findings at Step One where the ALJ progresses to Step Two.").

record . . . does not support [the] severity" of Plaintiff's pain allegations, arguing that the ALJ "conspicuously ignores any specific reference" to Plaintiff's hip pain. (Pl.'s Mem. at 6.) According to Plaintiff, the ALJ's finding referred only to Plaintiff's lumbar pain and his COPD, but not the pain in Plaintiff's hip. (Pl.'s Mem. at 6.) Defendant responds that the ALJ "did exactly what he was supposed to do," in that, after determining that Plaintiff had underlying medically determinable impairments, the ALJ determined that the intensity and persistence of Plaintiff's pain did not significantly interfere with Plaintiff's ability to perform basic work activities. (Def.'s Mem. at 15.) According to Defendant, the ALJ properly conducted the two-step *Craig* analysis. (Def.'s Mem. at 15.)

Here, the ALJ concluded that "the evidence is consistent with conservative treatment of the claimant's physical conditions" but that "[t]he record does not support the alleged severity of the claimant's impairments." (R. at 22.) The ALJ acknowledged that radiographic imaging showed mild degenerative changes in Plaintiff's lumbar spine and a CT scan of Plaintiff's pelvis revealed "stage two or three avascular necrosis of the right femoral head." (R. at 20, 22.) Despite these impairments, the ALJ noted that narcotic pain medications were not indicated, Plaintiff's pain, muscle spasms and COPD were managed with medication, Plaintiff reported no difficulty managing his personal care and hygiene and Plaintiff continued to shop for groceries, help with household chores and prepare meals. (R. at 22.) The ALJ further noted that Plaintiff ambulated without an assistive device. (R. at 22.)

The ALJ noted that, despite Plaintiff's reported impairments, Plaintiff was able to manage his personal care and hygiene without any difficulty; prepare meals; shop for groceries; attend medical appointments; manage his finances; help wash dishes, vacuum, and mow the lawn; help

take care of cats and dogs; take public transportation; spend time talking with other people in person and by telephone; and did not have an assistive device. (R. at 22.)

The ALJ also weighed the evidence submitted via a third-party function report by Ms. Walker, Plaintiff's friend. (R. at 22.) Ms. Walker stated that Plaintiff "doesn't do pretty much anything during the day but eat, sleep, bathe and sleep," that Plaintiff's "back aches" affect his sleep and that Plaintiff prepares his own meals but that it is "hard for him to do chores." (R. at 254-61.) Ms. Walker stated that Plaintiff's injuries affect his lifting, bending, standing, kneeling, walking, sitting, seeing, memory, understanding, ability to follow instructions, hearing, concentration and ability to complete tasks. (R. at 263.) Ms. Walker also provided that Plaintiff can only lift 25 pounds or less, that bending, standing and kneeling hurts, that Plaintiff needs glasses to see and that Plaintiff has to "sit for a rest" after walking. (R. at 264.) In assessing Ms. Walker's opinion, the ALJ opined that, "although Ms. Walker is familiar with the claimant's daily functioning, there is no evidence she has any SSA laws and regulations expertise." (R. at 22.) The ALJ therefore found that Ms. Walker's conclusions were not consistent with the record and accordingly assigned Ms. Walker's opinion little weight. (R. at 22.)

The Court finds that there is substantial evidence to support the ALJ's findings concerning Plaintiff's subjective complaints. The ALJ, after outlining the objective medical evidence, provided a lengthy review of Dr. Seacrist and the DDS medical consultants' findings. (R. at 20-21.) The ALJ also reviewed Plaintiff's CT scan, radiographic imaging and medication use. (R. at 20-22.) The ALJ discussed Plaintiff's complaints of hip pain, a "knot on his back", low back pain, joint pain, occasional coughing and shortness of breath. (R. at 20-22.) Contrary to Plaintiff's suggestion that the ALJ "conspicuously ignore[d] any specific reference to [Plaintiff's] hip pain" (Pl.'s Mem. at 6), the ALJ referenced Plaintiff's hip pain, hip imaging and prescribed medication

to treat hip pain. (R. at 20-22.) After considering the above, and assigning weight to the statements of Dr. Seacrist, the DDS medical consultants, Plaintiff and Ms. Walker, the ALJ found that the limitations alleged by Plaintiff are not supported by the record. (R. at 22.) Together, the evidence supports the ALJ's assessment of Plaintiff's subjective complaints. Because the ALJ appropriately explained why the evidence is consistent with conservative treatment of Plaintiff's physical conditions and why the record proved inconsistent with Plaintiff's subjective complaints, the Court finds that substantial evidence supports the ALJ's explanation. The Court, therefore, finds that the ALJ did not conduct an improper *Craig* analysis, and declines to recommend remand on that basis.

### 2.   *The ALJ Did Not Err in His Evaluation of Dr. Seacrist's Opinion.*

Plaintiff next argues that the ALJ erred by "rejecting" the opinion of Dr. Seacrist. (Pl.'s Mem. at 5.) Specifically, Plaintiff alleges the ALJ failed to apply the treating physician rule in evaluating Dr. Seacrist's opinion. (Pl.'s Mem. at 5.) Defendant responds that there is no merit to Plaintiff's argument because Dr. Seacrist is not Plaintiff's treating physician. (Def.'s Mem. at 19.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. §§ 404.1512(a)-(e), 404.1527, 416.912 (a)-(e), 416.927. When the record contains a number of medical opinions, including those from Plaintiff's treating physician(s), consultative examiners and other sources, and when those opinions are consistent, then the ALJ makes determinations based on that evidence. *See* §§ 404.1527(c)(2),415.927(c)(2). If, however, the medical opinions are inconsistent with each other or with other evidence, then the

ALJ must evaluate the opinions and assign them differing weight to properly analyze the evidence involved. §§ 404.1527(c)(2), (d), 416.927(c)(2), (d).

Under the regulations, only an "acceptable medical source" may be considered a "treating source." SSR 06-03p, 2006 WL 2263437 (Aug. 9, 2006). Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. §§ 404.1527(a), 416.927(a). A "treating source" is a medical source who provides, or has provided, the claimant with medical treatment or evaluation and who has, or has had, an ongoing *treatment* relationship with the claimant. §§ 404.1527(a)(2), 416.927(a)(2).

 A treating physician's opinion must be given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. §§ 404.1527(d)(2), 416.927(d)(2); *Craig*, 76 F.3d at 590; SSR 96-2p, 1996 WL 374188 (July 2, 1996). However, the regulations do not require the ALJ to accept opinions from a treating physician when the physician's opinion is inconsistent with other evidence or when it is not otherwise well supported. §§ 404.1527(d)(3)-(4), (e), 416.927(d)(3)-(4), (e). Moreover, if a physician's opinion is "not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'" *Dunn*, 607 F. App'x. at 267 (citing *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992)). Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded. *Id.*

In December 2016, the SSA referred Plaintiff for a medical consultative examination. (R. 20, 43). Dr. Joseph Seacrist, M.D. performed an examination and evaluation of Plaintiff on

14

December 17, 2016. (R. at 372.) Plaintiff's chief complaints to Dr. Seacrist included muscle spasms in his back and arthritis in his right rip. (R. at 372.) According to Dr. Seacrist's Medical Consultant Report ("Report"), Dr. Seacrist reviewed Plaintiff's medical records, including a CT scan and notes from Plaintiff's primary care physician. (R. at 372.) Dr. Seacrist then gathered Plaintiff's medical, family, social and substance use histories and performed a physical examination of Plaintiff. (R. at 272-73.) Dr. Seacrist made general findings, including that Plaintiff's hips have a "reduced [range of motion] due to pain," that Plaintiff "[h]as more pronounced pain with internal rotation of the right hip versus external rotation. Has pain in the lumbosacral region with pelvic compression," and "[i]mpaired lumbar [range of motion] in all planes due to pain and stiffness that starts at the right hip and radiates up the right side of the spine." (R. at 374.) Dr. Seacrist diagnosed Plaintiff with chronic low back pain, avascular necrosis of the right femoral head and hypertension. (R. at 374.) Based on the examination and history obtained, Dr. Seacrist made a functional assessment and medical source statement, finding that Plaintiff demonstrates a moderate level of functional impairment based on Plaintiff's avascular necrosis of the femoral head. (R. at 374.) Dr. Seacrist concluded his Report with the expected hours Plaintiff can walk — less than two hours — and sit — about six hours — in an eight-hour work day. (R. at 375.) Dr. Seacrist concluded that Plaintiff could occasionally carry and lift ten pounds and frequently carry and lift less than ten pounds. (R. at 375.) According to Dr. Seacrist's Report, these findings are consistent with "sedentary work." (R. at 375.) Dr. Seacrist concluded that Plaintiff does not need an assistive device to ambulate. (R. at 375.)

The ALJ reviewed Plaintiff's examination visit with Dr. Seacrist, outlining Plaintiff's reported complaints and symptoms and Dr. Seacrist's conclusions. (R. at 20.) The ALJ noted that Plaintiff, according to Dr. Seacrist's Report, demonstrated mild difficulty navigating the exam

room, but was able to perform tandem gait with some difficulty, stand on his toes, was in no acute distress, was able to rise from his chair without difficulty and did not use an assistive device to ambulate. (R. at 20.) Given these findings, the ALJ ultimately found that, while the record supports "some exertional and postural limitations due to the claimant's pain and reduced range of motion in the back and right hip, it is consistent with a limitation to light work activity, not sedentary." (R. at 20.) The ALJ found that Dr. Seacrist did not account for further limitations to unskilled work with breaks from concentration due to distraction from pain or additional environmental limitations due to Plaintiff's COPD. (R. at 20.) Accordingly, the ALJ gave Dr. Seacrist's opinion partial weight. (R. at 20.)

At the outset, contrary to Plaintiff's assignment of error, Dr. Seacrist was never Plaintiff's treating physician. Plaintiff was referred to Dr. Seacrist by the SSA for a medical consultative examination. (R. at 20, 43.) Dr. Seacrist did not provide Plaintiff medical treatment and did not have an ongoing treatment relationship with Plaintiff. *See* §§ 404.1527(a)(2), 416.927(a)(2). While Dr. Seacrist provided an evaluation of Plaintiff's medical conditions, he did not provide treatment, did not prescribe medication and he did not refer Plaintiff to see a specialist. (R. at 372-75.) Nothing in the record suggests that Plaintiff was examined by Dr. Seacrist before or after the December 17, 2016 examination date. The weight afforded to Dr. Seacrist's opinion, therefore, should be less if it is inconsistent with other substantial evidence in the record. *See Craig*, 76 F.3d at 590.

Additionally, substantial evidence supports the ALJ's decision, because the ALJ articulated the reasons he assigned Dr. Seacrist's opinion partial weight, citing Plaintiff's mild difficulties presented during his visit to Dr. Seacrist. (R. at 20.) Other evidence in the record further supports the ALJ's decision to afford Dr. Seacrist's opinion partial weight. The ALJ considered the

16

conclusions of DDS medical consultants, who found that Plaintiff had the functional capacity to perform work activity at the light exertional level with additional limitations. (R. at 20-21.) The ALJ considered Plaintiff's own testimony, including Plaintiff's ability to manage his personal care and hygiene, prepare "two-course meals," shop for groceries, attend medical appointments, wash dishes, vacuum, mow the lawn and take public transportation. (R. at 22.) Since Dr. Seacrist's opinion was not fully supported by other clinical evidence and was somewhat inconsistent with other substantial evidence, the ALJ properly accorded it less weight. *See Craig*, 76 F.3d at 590. Therefore, substantial evidence supports the ALJ's decision to afford Dr. Seacrist's opinion partial weight.

### 3. The ALJ Properly Accounted for the Effect of Plaintiff's Pain on His Ability to Concentrate.

Next, Plaintiff argues that the ALJ failed to properly account for the effects of pain on Plaintiff's ability to concentrate. (Pl.'s Mem. at 6.) Specifically, Plaintiff asserts that the ALJ erred in stating that Plaintiff's pain would result in his being limited to two-hour periods of concentration, which, according to Plaintiff, "unquestionably indicates at least a moderate limitation in concentration, persistence and pace," requiring a greater limitation than the one imposed. (Pl.'s Mem. at 6.) Defendant responds that Plaintiff improperly frames the issue, because the ALJ found that Plaintiff suffered from only physical impairments and did not find that Plaintiff suffered from any mental impairments. (Def.'s Mem. at 21.)

The ALJ must consider possible mental impairments at multiple steps in the five-step process. At step two, the ALJ determines whether the claimant's medical impairments meet the regulations' severity and duration requirements. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A claimant whose impairments

meet, or are medically equivalent to, the requirements of impairments contained in the regulations is considered unable to function adequately in work-related activities. SSR 85-16, 1985 WL 56855 (Jan. 1, 1985). A claimant whose impairments are found to not be severe is considered "not to be significantly restricted in the ability to engage in basic work-related activities." *Id*. A claimant whose impairments fall between severe and not severe has a significant restriction in the ability to engage in some basic work-related activities. *Id*. For individuals who fall between severe and not severe, the ALJ must consider the impairment in formulating the claimant's RFC. *Id*.; *see also Mascio*, 780 F.3d at 638. "While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may—when considered with limitations or restrictions due to other impairments—be critical to the outcome of a claim." SSR 96-8p, 1996 WL 374184 (July 2, 1996).

In *Mascio*, the Fourth Circuit explained how an ALJ should consider a claimant's impairments in formulating an RFC, requiring an ALJ to provide a sufficient explanation of how a claimant's impairments were or were not addressed in the RFC. 780 F.3d at 635-37. There, the RFC formulated by the ALJ failed to incorporate the claimant's limitation and the ALJ neglected to discuss the claimant's ability to perform certain functions for a full workday. *Id.* at 637. The Fourth Circuit remanded because the ALJ's opinion lacked the analysis required for a meaningful review and left the court "guess[ing] about how the ALJ arrived at her conclusion . . . ." *Id.* at 636-37. An ALJ satisfies *Mascio* by providing a "detailed discussion of a plaintiff's capacity for concentration, persistence, or pace." *Thomas v. Colvin*, No. 4:14cv105, 2016 WL 1070826, at *4 (E.D. Va. March 16, 2016). *Mascio* did not, however, establish a *per se* rule that a plaintiff's moderate impairment in concentration, persistence or pace must always translate into an RFC limitation. Rather, *Mascio* highlighted the ALJ's duty to review the evidence and explain his

decision when the claimant has moderate limitations in concentration, persistence or pace. 780 F.3d at 638. If an ALJ finds that the claimant has moderate difficulties in maintaining concentration, persistence or pace at step three, the ALJ must address these difficulties when formulating the claimant's RFC. *Id.*

Thus, when an ALJ conducts the RFC analysis, he must conduct a function-by-function analysis, including a "narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at 636 (quoting SSR 96-8p). When arriving at his conclusions regarding the claimant's RFC, the ALJ must "build an accurate and logical bridge from the evidence to [the ALJ's] decision" in order for the reviewing court to evaluate the ALJ's decision. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016).

Here, the ALJ did not find that Plaintiff had moderate limitations in maintaining concentration, persistence and pace. (R. at 18-19.) In fact, Plaintiff did not allege disability due to any mental impairments. The ALJ did, however, include the following limitation in Plaintiff's RFC: "The claimant is able to . . . concentrate for periods of two hours on work-related tasks before requiring a break." (R. at 19.) Because the ALJ included this limitation in Plaintiff's RFC, the ALJ must provide a "narrative discussion" to support his conclusion. *Mascio*, 780 F.3d at 636; SSR 96-8p. First, the ALJ explained that due to "distraction from pain," he included a break every two hours to provide relief from the need to concentrate. (R. at 21.) To support his suggestion that Plaintiff may suffer from distraction due to pain, the ALJ observed that Plaintiff reported difficulty concentrating. (R. at 21.) The ALJ also cited Plaintiff's medical reports from Dr. Karl Smith and Dr. Christopher Ackerman, all containing complaints of pain. (R. at 337, 339, 343-47, 350, 372-76, 378-402.) Both the consultants and Dr. Seacrist's failure to account for Plaintiff's potential

distraction due to pain contributed, in part, to the ALJ's assignment of partial weight to each opinion. (R. at 20-21.) When reviewing the record, the ALJ also cited to nonmedical evidence. The ALJ discussed Plaintiff's reports of difficulty concentrating, but explained that, despite his impairments, Plaintiff reported he was able to manage his personal care and hygiene, manage his finances and spend time talking with other people in person and by telephone. (R. at 21-22.)

Plaintiff also makes a brief argument that the ALJ failed to cite substantial evidence that Plaintiff has the "ability to maintain focus and attention" for two-hour intervals. (Pl.'s Mem. at 6.) This Court previously held that an ALJ appropriately accounts for a claimant's moderation limitations in concentration, persistence and pace — and specifically the ability to stay on task — when the ALJ restricts the claimant to simple, routine repetitive tasks for fixed periods of time. *See Fowler v. Colvin*, No. 3:14cv855, 2015 WL 8488971, at *7 (E.D. Va. Oct. 13, 2015), *report and recommendation adopted*, 2015 WL 8484443 (E.D. Va. Dec. 9, 2015) ("Though [the ALJ] did not explicitly use the terms "pace" or "persistence" in the limitations, the ALJ properly included Plaintiff's psychological deficiencies in the hypothetical posed to the VE . . . [by describing] a worker who could not work more than two hours at a time without a break."); *Baskerville v. Colvin*, No. 3:14cv423, 2015 WL 5786488, at *13, n.6 (E.D. Va. Sept. 30, 2015), *report and recommendation adopted*, 2015 WL 5786488, at *1 (finding that *Mascio* had "no effect" on case where ALJ found plaintiff could perform simple, repetitive tasks and sustain concentration towards such tasks for two-hour segments"). Other courts have similarly found that including this type of time-specific limitation accounts for a claimant's ability to stay on task and, therefore, complies with *Mascio*. *Roope v. Berryhill*, No. 5:16-cv-00048, 2017 WL 1364603, at *3 (W.D.N.C. Apr. 13, 2017) ("An explanation of how long a claimant is able to sustain concentration and attention to perform tasks is a direct accounting for the claimant's ability to stay on task – and

difficulties in concentration, persistence and pace."); *Fender v. Berryhill*, No. 1:17-cv-00041, 2018 WL 1536485, at *7 (W.D.N.C. Mar. 29, 2018) ("[T]he Court finds that a two-hour limitation directly addresses Plaintiff's moderate limitations in concentration, persistence or pace[.]").

Consistent with the above precedent, the Court finds that the ALJ appropriately accounted for Plaintiff's potential distractions from pain and ability to maintain focus and attention by limiting him to simple and routine work-related instructions and by imposing a break after two hours of concentration. (R. at 19.) Further, the Court finds that the ALJ properly accounted for the effect of Plaintiff's pain on his ability to concentrate and that substantial evidence in the record supports the ALJ's RFC assessment.

### B. The ALJ Properly Accounted for Plaintiff's Marginal Reading Ability.

Finally, Plaintiff argues that the ALJ failed to account for Plaintiff's "functional illiteracy" at step five. (Pl.'s Mem. at 7-9.) Specifically, Plaintiff alleges that the ALJ's hypothetical question to the VE failed to account for Plaintiff's reading limitations. (Pl.'s Mem. at 7.) Defendant responds that Plaintiff's argument is "without merit for several reasons," arguing that the VE testimony directly refutes Plaintiff's argument and substantial evidence supports the ALJ's finding that Plaintiff had a marginal reading ability. (Def.'s Mem. at 23-24.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering the claimant's age, education, work experience and RFC, he could perform other work that exists in significant numbers in the national economy. § 404.1520(a)(4)(v). The Commissioner can carry his burden at the last step with the testimony of a VE. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989). During the VE's testimony, the ALJ must pose hypothetical questions that accurately represent the claimant's RFC based on all of the record evidence and a fair description of all of the claimant's impairments; these hypotheticals enable the VE to offer testimony about any jobs

existing in the national economy that the claimant can perform. *Id.* Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.*; *see also Hines v. Barnhart,* 453 F.3d 559, 567 (4th Cir. 2006) (finding that the VE's testimony had no value, because he did not take all the claimant's impairments into account).

Here, during Plaintiff's hearing, the ALJ solicited testimony from VE Andrew Beal, posing several hypotheticals to Mr. Beal based on possible RFC limitations. (R. at 60-64.) In his first hypothetical, the ALJ asked Mr. Beal to imagine an individual of the same age as Plaintiff and with the same educational background and work experience, with a twelfth-grade high school education, albeit special education, with some difficulty reading. (R. at 60-61.) The ALJ then detailed the RFC limitations he ultimately adopted and asked Mr. Beal whether such an individual could perform Plaintiff's past work. (R. at 61.) Mr. Beal responded that Plaintiff's past work was at a "hard exertional level," so Plaintiff's RFC limitations would not allow for it. (R. at 62.) When asked if there was other work in the local or national economy that would be consistent with the previous hypothetical, however, Mr. Beal responded that such person could perform unskilled light work, including the representative occupations of cleaner, sorter and packer, all of which had at least 57,000 jobs in the national economy. (R. at 62, 63.) The ALJ added that such hypothetical individual would need to avoid exposure to respiratory irritants such as dust, fumes, odors, gases and the like. (R. at 62.) Mr. Beal modified his response, suggesting that such individual may need to avoid a position like laundry sorter, but that there would be other sorting jobs that exist in the national economy that the hypothetical individual could perform. (R. at 62-63.) After the ALJ posed two additional hypotheticals, Plaintiff's counsel ("PC") questioned the VE:

[PC]: Dr. Beal, would illiteracy have any impact on the jobs that you named?

[VE]: No, I don't think so. Not in the work activity, no.

. . .

[ALJ]: All right, and no impact for initially learning the work either?

[VE]: No, I think these jobs could be learned with demonstration.

(R. at 64.)

In making disability determinations, the ALJ relies on the Directory of Occupational Titles ("DOT") and VEs for information about the requirements of work in the national economy. SSR 00-04P, 2000 WL 1898704 (Dec. 4, 2000). "Neither the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict" between VE evidence and the DOT; instead the ALJ must resolve the conflict by "determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." *Id.*

The DOT provides five levels of "language development," requiring different criteria at each level. To achieve Level 1 under the DOT's "language development" section, a claimant must be able to recognize the meaning of 2,500 two- or three-syllable words, read at a rate of 95-120 words per minute and compare similarities and differences between words and between series of numbers. U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991.) To achieve Level 2, a claimant must be able to have a passive vocabulary of 5,000-6,000 words, read at a rate of 190-215 words per minute, read adventure stories and comic books and read instructions for assembling model cars and airplanes. *Id.* A claimant's ability to read or write affects his literacy levels; under the regulations, a claimant is considered illiterate if he cannot read or write a simple message such as instructions or inventory lists. §§ 404.1564(b)(1), 416.964(b)(1). While numerical grade levels may represent educational abilities, this is not always the case. §§ 404.1564(b), 416.964(b).

The DOT also includes "definitional requirements" that list specific vocational preparation ("SVP") time for each described occupation. U.S. Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991). SVP corresponds to the skill level definitions outlined in 20 C.F.R. §§ 404.1568, 416.968.[7] *See* SSR 00-04P, 2000 WL 1898704 (Dec. 4, 2000). "Unskilled work" corresponds to an SVP of 1-2, "semi-skilled work" corresponds to an SVP of 3-4 and "skilled work" corresponds to an SVP of 5-9 in the DOT. *Id.* The "definitional requirements" for the jobs listed in the DOT, however, are "merely advisory in nature and serve only as a reference for the ALJ and the VE." *Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994). To "hold that the DOT 'definitional requirements' are binding on the ALJ would lead to the absurd result of rendering anyone who is illiterate unqualified and unable to perform any of the jobs in the DOT." *Id.* at 290. Moreover, while "literacy may significantly limit an individual's vocational scope, the primary work functions in most unskilled occupations involve working with things (rather than with data or people). In these work functions, education has the least significance." 20 C.F.R. Pt. P, App. 2.

Plaintiff argues that the ALJ's initial hypothetical question to the VE, where the ALJ explained that Plaintiff had been in special education and that his reading ability was "marginal," fails to account for Plaintiff's reading limitations. (Pl.'s Mem. at 7.) Moreover, Plaintiff argues[8]

---

[7]    As relevant here, "[u]nskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time . . . Semi-skilled work is work which needs some skills but does not require doing more complex work duties . . . Skilled work requires qualifications in which a person uses judgment to determine the machine and manual operations to be performed in order to obtain the proper form, quality, or quantity of material to be produced." 20 C.F.R. §§ 404.1568(a)-(c), 416.968(a)-(c).

[8]    While the "definitional requirements" in the DOT are merely advisory, it should be noted that Plaintiff conflates language development Level 2 with SVP Level 2; the representative occupation housekeeper/cleaner, for example, requires Level 1 for language development, but Level 2 for SVP. DOT # 323.687-014, 1991 WL 672783 (4th ed. 1991).

that the jobs identified by the VE during the hearing require the ability to read at Level 2 of language development and that Plaintiff "clearly cannot read at Level 2." (Pl.'s Mem. at 8.)

The record supports the ALJ's characterization of Plaintiff's "marginal" reading ability. Although Plaintiff testified that he "can't read too good," Plaintiff represented that he ceased attending "separate classes for slow learning" once he was in the sixth grade, completed the twelfth grade and received a regular diploma. (R. at 53, 112.) While Plaintiff has "some problems reading," it is sometimes due to his vision; he "doesn't always have his reading glasses on him." (R. at 112.) Further, Plaintiff buys and reads the Brunswick Gazette weekly and manages his own finances. (R. at 22, 112.) Moreover, the ALJ appropriately included an individual who participated in special education and had "difficulty reading" in his hypothetical posed to the VE. (R. at 61.) To confirm, the ALJ, along with Plaintiff's counsel, revisited the question of literacy, confirming that illiteracy would have no impact on either initially learning the jobs listed or completing the required work activity. (R. at 64.) Substantial evidence, therefore, supports the ALJ's characterization of Plaintiff's reading ability as "marginal" and the ALJ appropriately included Plaintiff's reading abilities in his hypothetical questions posed to the VE. Accordingly, the Court finds that the ALJ's finding of "not disabled" was supported by substantial evidence.

## V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 12) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge M. Hannah Lauck.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

_____/s/_____

Elizabeth W. Hanes
United States Magistrate Judge

Richmond, Virginia
Date: July 30, 2020

26